UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLEN HARRIS, individually, and P.P.A as guardian for K.H., a minor child,<br>    Plaintiffs<br>v.<br><br>JOHNMICHAEL O'HARE;<br>ANTHONY PIA; and<br>CITY OF HARTFORD,<br>    Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO. 3:08CV1644(RNC)<br><br><br><br><br><br><br><br>SEPTEMBER 7, 2016 |

## AFFIDAVIT

STATE OF CONNECTICUT   }

                } ss: Hartford

COUNTY OF HARTFORD    }

    The undersigned, Jon L. Schoenhorn, being duly sworn according to law, hereby deposes and states as follows:

    1. I am over the age of eighteen years and understand the obligations of an oath.

    2. I am an attorney and have represented the plaintiffs, Glen Harris, individually, and P.P.A. as guardian for K.H., a minor child, since prior to the time this action was commenced in 2008.

    3. I have been a member of the bar of the State of Connecticut in good standing since October, 1982, and a member of the District of Columbia Bar since April, 1990. I was admitted to the United States District Court for the District of Connecticut in November, 1982. I am also a member of the bar in the following federal jurisdictions: Second Circuit Court of Appeals (1985); United States Supreme Court (1989); D.C. Circuit Court of Appeals (1994); Third Circuit Court of Appeals (1994); Fourth Circuit Court of Appeals (1994); Fifth Circuit Court of Appeals (2005) Seventh Circuit Court of Appeals ( 2002); U.S. District Court for the District of Columbia (June, 1991); U.S. District Court for the District of Maryland (January, 1993); and U.S. District Court for the Northern District of Illinois (February, 1995).

    4. The facts of the instant case, as set forth in the complaint, were testified to at a six-day trial in May 2012.

5. After the jury found for the defendants, the court (*Chatigny, J.*), on September 28, 2012, denied Plaintiffs' motions for judgment as a matter of law and new trial, brought pursuant to Federal Rules of Civil Procedure 50 and 59. The plaintiffs appealed to the Second Circuit Court of Appeals on October 25, 2012.

6. On October 20, 2014, the Second Circuit Court of Appeals, in a signed opinion, held that as a matter of law, the defendant officers had no basis on which their intrusion would have been lawful, and therefore they violated the plaintiffs' Fourth Amendment rights. *Harris v. O'Hare*, 770 F.3d 224, 241 (2d Cir. 2014). The court also held the officers were not entitled to qualified immunity because it would not have been objectively reasonable for the officers to believe their conduct was lawful. As a result, the court remanded the matter for a new trial on the issue of damages. *Id.*

7. The defendants asked the Second Circuit for rehearing. After approximately six months, the petition for rehearing was denied. The defendants then brought a petition for writ of certiorari to the United States Supreme Court which was denied.. *O'Hare v. Harris*, 136 S.Ct. 792 (2016).

8. The plaintiffs filed an application for prejudgment remedy against defendants O'Hare and Pia on July 7, 2015, and subsequently filed a request to schedule a hearing on January 13, 2016. The hearing took place on June 30, 2016, before Magistrate Judge Donna Martinez. As of this date there has been no decision on that application. The undersigned incorporates by reference the pleadings from that application herein.

9. During the week of August 29, 2016, I identified Mayor Luke Bronin on a Fox61 News program. He was being interviewed about whether "the word 'bankruptcy' was being floated around," to which he responded, "my goal is to do everything to avoid that." Erin Logan, Hartford Fighting the Possibility of Bankruptcy with Help from Other Cities, Towns, Fox61 News, August 29, 2016, http://fox61.com/2016/08/29/hartford-fighting-the-possibility-of-bankruptcy-with-help-from-other-cities-towns/. I have met Mayor Bronin and I recognize his face and voice.

10. The Mayor was also interviewed by reporter Gregory Seay of the Hartford Business Journal on June 20, 2016. He is quoted as stating, "There's a limit to how much you can cut, and

2

we have long ago passed the ability of how much more you can tax...we are not afraid to do difficult things." See attached. I interpret this statement as suggesting that the city is unable to pay its debts.

11. Despite it's prior stipulation to indemnify the defendant officers O'Hare and Pia, the City of Hartford is now refusing to do so. See plaintiff's motion in limine to preclude defendant city from arguing that it will not indemnify defendant officers. (Doc. 189-8, pp. 24-27).

12. On September 6, 2016, Assistant Corporation Counsel Feola-Guerrari stated to Magistrate Judge Martinez and the undersigned counsel during a telephone conference that as of August 25, 2016, the city's insurance company will not cover any damage award in this case, nor does the city believe it has any obligation to indemnify the defendant officers.

I have read the foregoing affidavit, and hereby swear and affirm, under the penalty of perjury, that it is true and accurate to the bets of my knowledge and belief.

Dated at Hartford, Connecticut this 7th day of August, 2016.

_____
Jon L. Schoenhorn

# Attachments

ADVERTISEMENT



http://www.hartfordbusiness.com

# Hartford seeks fiscal solutions outside bankruptcy

BY **GREGORY SEAY**

6/20/2016



PHOTO | HBJ FILE

Bankruptcy is one option Hartford faces for its financial woes.

A bankruptcy filing by the city of Hartford is one of several options for potentially solving the city's fiscal woes, its mayor says, but legally declaring insolvency is at the bottom of a list of solutions the city is pursuing.

"We want to do everything we can to avoid that outcome,'' Luke Bronin said in a recent interview with Hartford Business Journal.

Not only would bankruptcy cast a darker pall on the city, but even if Hartford won the state's permission tomorrow to file Chapter 9, its over-reliance on too much debt and too little revenue from a limited, overtaxed pot of residential/commercial properties would continue hounding it, Bronin and others say.

"It is not a panacea,'' said Hartford bankruptcy attorney Eric Henzy, of law firm Reid & Riege. "It's not something you just jump into and say it's going to solve our problems.''

### SIDEBAR: Other ways Hartford could get paid

New regional revenue sources, along with options other than a costly bankruptcy filing, which would primarily benefit the city by allowing it to crack open collectively bargained pacts with its city workers, must be identified, Bronin says. Several city-employee unions say they have shared a list of their ideas with city hall.

### Limited fiscal options

But the mayor, who is nearly six months into his elected tenure as chief of Connecticut's Capital City and second largest by population, said Hartford's options for righting its fiscal ship are extremely limited. Hartford sits as the state's most property-tax burdened municipality, with a mill rate of $74.29 for every $1,000 of assessed property value.

Moreover, the city has begun layoffs of city workers, Bronin said, particularly those whose jobs are not directly tied to public safety, such as police and fire, and vital city services, such as public health-safety checks and certain social services.

Even marshalling every nickel in savings from layoffs, operating cutbacks and renegotiating wage pacts with city-worker unions, Hartford still faces a minimum $48 million budget deficit for the ensuing fiscal year, Bronin says.

Backed against that wall, the city is weighing any or all of its options for solving its financial misfortunes, saving a bankruptcy filing as its final contingency, he said.

"There's a limit to how much you can cut," the mayor said, "and we have long ago passed the ability of how much more you can tax. ... We are not afraid to do difficult things."

## Regional solution

The biggest challenge the city faces, Bronin said, is curbing its reliance on property taxes to run the city and provide services to residents and businesses.

Among the potential regional solutions, Bronin said, "I'm talking about many different types of regional services sharing."

It, too, may mean, he said, the city seeks new revenue sources or shares in some existing ones, such as the state sales or income taxes, or perhaps even establishing a regional property tax.

But any of those options would require legislative approval, a tall task considering the state's own financial woes. The General Assembly did vote earlier this year to allow the city to keep proceeds from the state's 10 percent admissions tax charged to Dunkin' Donuts Park ticket buyers. However, the city has yet to benefit from the measure due to the ballpark's delayed opening.

Bronin said that aside from input from his aides and fellow city leaders, he also has reached out to the city's employee unions, as well as to Hartford's business community, and to his fellow mayors and first selectmen in neighboring suburbs.

## No solo solution

"We can't solve this problem on our own," he said. "There is a growing recognition that if Connecticut and the capital region are going to compete with metro centers around the U.S., we have to position the heart of the region as a strong, growing, vibrant commercial and cultural center."

Hartford's conservative think-tank, The Yankee Institute, was among the first to openly explore the potential impact of a Hartford bankruptcy filing in a May 26 blog post. It notes that the city's financial woes underscore the shortcomings of binding arbitration in collective bargaining and should not be overlooked.

"It's really important for everyone across the state to pay more attention to what's happening in Hartford, especially because taxpayers who live outside of Hartford fund about half the city's budget," Yankee President Carol Platt Liebau said via email.

## Close calls

One of the nation's richest states, Connecticut only once had one of its cities file for bankruptcy — which was later withdrawn — although several have come close. Nationwide, cities ranging from Detroit, Mich., to a pair of California communities — Stockton and Vallejo — to tiny Central Falls, R.I., have filed for, and emerged from, Chapter 9 in the past decade.

Connecticut's closest call occurred in 1991, when then-struggling Bridgeport shocked the state with its filing. However, reluctant state leaders eventually allowed that city to tap into a $15 million "lock box" of funds earmarked for the city, prompting dismissal of the filing. Later, Connecticut lawmakers enacted the law mandating the governor's approval for future municipal bankruptcy filings.

Next, in the early '90s, came oversight of the shoreline city of West Haven and the state receivership of Griswold's Jewett City borough, and, in 2001, oversight of Waterbury. All four oversight boards eventually were dissolved after satisfying specific milestones, including creating a sustainable finance plan. Waterbury, in particular, emerged on better financial footing, though some observers say its fiscal affairs remain tenuous.

"Waterbury is still in a very difficult financial position," said veteran city firefighter John Schultz, who is president of the city's 225-member firefighters' union Local 1339. Even with the board's oversight, it was anticipated to take 20 years for Waterbury to make up for lost financial ground, Schultz said.

Waterbury firefighters, he said, openly opposed an oversight board, and, later, when the board began negotiating labor pacts as they came due, their union wasn't treated as fairly as their peer bargaining units.

However, with better fiscal controls in place and charter changes, his city is much better off today than it was a decade earlier, Schultz said. One such charter change decreed the city's pension contributions and assets benefit only retirees, and not be used, as they were in years leading up to Waterbury's crisis, to pave streets and fund other city projects, especially during election years, he said.

## Collaboration is key

Noting that Hartford's woes are shaded more differently than Waterbury's, Schultz said it would behoove Hartford's city bargaining units to work collectively with the city to craft ways to close current and future deficits. He also suggests both sides first undertake a thorough audit to get a clearer picture of the city's finances.

"I think there's a lot more to be heard there," Schultz said.

Bronin faced fierce resistance from unions, nonprofits and others earlier this year on his failed state legislative proposal to create a similar financial sustainability commission for the city of Hartford. The commission would have given an oversight board made up of various constituents, including two business representatives and one union representative, among others, final say over new labor contracts and the ability to negotiate pension and health benefits.

Hartford police Sgt. Richard Holton III is president of their union local. Holton said his 402 members want to help the city dig out of its financial hole, even presenting the mayor a list of their ideas for generating revenue beyond property taxes. But Bronin's call for salary/benefit cuts of $10,000 to $12,000 per officer annually are unacceptable, he said.

The police and other city unions, he said, prefer the city exhaust all available revenue options before it weighs bankruptcy.

"But at this point in time," Holton said, "I don't think that's happened yet."

## Union cooperation

The American Federation of State, County and Municipal Employees (AFSCME), representing about 750 city and school-system workers, says, it too, has had talks with Bronin on mutually beneficial solutions to the city's woes. Just recently, about 200 city custodians agreed to a new pact that lacks raises, said Council 4 AFSCME Executive Director Sal Luciano. Also underway are negotiations for a new contract covering some 500 city workers, among them dispatchers, public works staff and librarians, Luciano said.

The city, too, has discussed with its bargaining units, he said, the possibility of consolidating disparate health plans into a single one to save several million dollars annually.

Hartford's business community, too, insists on having a say in any resolution, according to MetroHartford Alliance CEO Oz Griebel.

Indeed, a Hartford bankruptcy filing alone won't guarantee all the city's financial problems are behind it, Griebel said. More important, says the chief of Hartford's regional chamber of commerce, many corporate leaders and others he has polled about a potential city bankruptcy insist any workout must involve collaboration from all key stakeholders — city leaders, workers and residential and corporate taxpayers.

Bronin agrees.

"We want them at the table as we try to design a regional solution," he said.

## Potential Chapter 9

Still, Hartford's persistent fiscal woes have it staring down the barrel of a potential Chapter 9 municipal bankruptcy.

Henzy, the Hartford bankruptcy lawyer, was a law clerk in Bridgeport bankruptcy court in 1991 when that city filed. His takeaway from Bridgeport's experience is that there are limits to a municipal bankruptcy that also raises enough questions and future uncertainty to truly render it the door of last resort.

Along with questions, Henzy said, as to the potential impact of a bankruptcy filing for Hartford's business, cultural and political image, not to mention the psyche of its residential, civic and corporate citizens, are others.

"What do you get out of it in the end?" Henzy said. "Are you on the path to fiscal sustainability?"

© 2016 HartfordBusiness.com