UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLEN HARRIS, Individually and P.P.A. as Guardian for K.H., a minor child | : : : | NO.: 3:08CV01644-RNC |
| v. | : : | |
| JOHNMICHAEL O'HARE, ANTHONY PIA, and CITY OF HARTFORD | : : : | OCTOBER 28, 2016 |

## DEFENDANTS O'HARE AND PIA'S RENEWED MOTION FOR JUDGMENT UNDER FRCP 50

Defendants Johnmichael O'Hare and Anthony Pia hereby renew their motion for judgment as a matter of law, as set forth below.

## I. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 50(b), a court may grant a motion for judgment as a matter of law notwithstanding the verdict only when (1) there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have resulted from sheer surmise and conjecture" or (2) there is such an "overwhelming amount of evidence in favor of the movant that reasonable and fair minded" people could not have reached a verdict against the moving party. *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir. 1993) (citing *Mattivi v. South African Marine Corp., "Hugenot,"* 618 F.2d 163, 168 (2d Cir. 1980)). The Court "must consider all [of] the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, and must not substitute its choice for that of the jury between conflicting elements in the evidence." *Ortho Diagnostic Systems, Inc. v. Miles Inc.,* 865 F. Supp. 1073, 1078 (S.D.N.Y. 1994), appeal dismissed, 48 F.3d 1237 (Fed.

Cir. 1995). The court cannot "pass on the credibility of the witnesses . . . ." *Samuels,* 992 F.2d at 11—12 (citing *Mattivi*, 618 F.2d at 167). A motion for judgment notwithstanding the verdict should be granted when the evidence, viewed in the light most favorable to the non-movants, reasonably only permits one conclusion in the movant's favor.

## II. THE JURY COULD NOT REASONABLY OR LEGALLY HAVE FOUND THE DEFENDANTS LIABLE FOR TRESPASS.

. "The essentials of an action for trespass are: (1) ownership or possessory interest in land by the Plaintiff; (2) invasion, intrusion or entry by the Defendant affecting the Plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." *Bristol v. Tilcon Materials, Inc.,* 284 Conn. 55, 87—88, 931 A.2d 237 (2007). However, it has long been recognized in Connecticut that police officers who enter private property in the exercise of their official duties are treated as licensees, not trespassers. *Morin v. Bell Court Condominium Ass'n, Inc.*, 223 Conn. 323, 328, 612 A.2d 1197 (1992).

The Court first acknowledged this idea when it held that a firefighter that had been injured while on private property "in the performance of a public duty under a permission created by law" held a status "akin to that of a licensee." *Roberts v. Rosenblatt*, 146 Conn. 110, 113, 148 A.2d 142 (1959). In 1991, the Court held that this "firefighter's rule" applies to police officers as well, noting that no state that had recognized a similar rule had declined to extend it to police officers. *Furstein v. Hill*, 218 Conn. 610, 615—16 (1991); *see, e.g., Kreski v. Modern Wholesale Electric Supply Co.*, 429 Mich. 347, 357 n. 6, 415 N.W.2d 178 (1987); *Flowers v. Rock Creek Terrace*, 308 Md. 432, 442 n. 4, 520 A.2d 361 (1987); *Berko v. Freda*, 93 N.J. 81, 84, 459 A.2d 663

(1983); see also 2 Restatement (Second), Torts (1965) § 345(1), pp. 226—27 ("The liability of a possessor of land to one who enters the land only in exercise of a privilege, for either a public or private purpose, and irrespective of the possessor's consent, is the same as the liability to a licensee."). Police officers can enter the property regardless of the owner's consent and, in fact, the property owner would not be privileged to exclude them if the conditions for the exercise of their public duty exist. *Morin*, 223 Conn. at 328.

It is undisputed that both Defendants entered the Plaintiffs' lawn in the exercise of their public duties as police officers. At trial, there was extensive testimony that they had received a tip from George Hemingway, a known member of the West Hell Gang, that illegal guns were stored in a vehicle in the backyard of 297 Enfield Street in Hartford. They believed this tip to be reliable based upon their past interactions with Mr. Hemingway and their experience with this violent gang in general. At the time, both Defendants were assigned to the Hartford Police Department's Northeast Conditions Unit ("NECU"). One of the functions of the NECU was to reduce violence in this area of the city, an objective that certainly included removing illegal guns from the community. The Defendants, while on duty and wearing Hartford Police Department uniforms, entered the yard solely to retrieve the guns that they had reason to believe were in the backyard. They did not do so for any personal gain or purpose. They did not know who lived at the address and had no prior relationship with either Plaintiff. No reasonable jury could have believed that the Defendants were not acting in the performance of their public duties at this point. Although it was ultimately determined that the information they had received about the location of the guns was inaccurate, that does not change

the fact that the Defendants were acting in the performance of their public duties as police officers when they entered the Plaintiffs' property and walked along the side of the house. As the conditions for the exercise of their public duty existed, they held the status of licensees. Thus, it was not reasonable or legal for the jury to have found them liable for trespass.

The fact that the Defendants entered the Plaintiffs' property without a warrant is irrelevant to the determination that they were acting within the scope of their public duties. The Second Circuit ultimately held that no exception to the warrant requirement applied to the Defendants' entry onto the Plaintiffs' property, so the Defendants' warrantless search violated the Plaintiffs' civil rights. *Harris v. O'Hare*, 770 F.3d 224, 238 (2014). However, this ruling does not compel the conclusion that the Defendants were not performing their public duties. Several Connecticut statutes specifically contemplate similar situations. CONN. GEN. STAT. § 7-465 states:

> Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality . . .all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded **for infringement of any person's civil rights** or for physical damages to person or property . . .if the employee, at the time of the occurrence, accident, physical injury or damages complained of, **was acting in the performance of his duties and within the scope of his employment,** and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty. (emphasis added)

Furthermore, CONN. GEN. STAT. § 7-101a provides:

> Each municipality shall protect and save harmless any municipal officer, whether elected or appointed, of any board, committee, council, agency or commission . . .or any municipal employee, of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgement by reason of alleged negligence, **or for alleged infringement of any person's civil rights, on**

**the part of such officer or such employee while acting in the discharge of his duties.**  (emphasis added)

Both of these statutes recognize that it is possible for a public officer to infringe upon civil rights while acting in the performance of his/her public duties, and that any such infringements do not invalidate the fact that they were indeed acting pursuant to these duties.  Accordingly, the warrantless entry does not strip the Defendants of their status as licensees, because violations of civil rights can occur within the scope of duty and authority, and there is no dispute that the Defendants were acting within the scope of their duty and authority when they entered the Plaintiffs' property.

Even if the jury accepted the Plaintiffs' argument that the Defendants were on the Plaintiffs' property not to look for illegal guns, but to try to find the third suspect from a recent police pursuit of a Dodge Neon, the analysis remains the same. Entering the yard in search of a suspect who has fled is certainly in furtherance of police objective, and is within the scope of their duty as a police officers. Thus, the Defendants still would have held the status of licensees and not trespassers.

### III.     THE JURY COULD NOT REASONABLY OR LEGALLY HAVE AWARDED PUNITIVE DAMAGES.

The jury returned verdicts for the Plaintiffs on the search and trespass claims and verdicts for the Defendants on the seizure, conversion, and emotional distress claims. The jury's award included punitive damages of $16,000 against each Defendant relative to the search claim.  The award of punitive damages is unreasonable and contrary to the instructions that the jury received.  "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme

conduct." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266—67, 101 S.Ct. 2748 (1981). These rationales for punitive damages were explained to the jury, along with the fact that awarding them is a matter left to the jury's discretion. The jury was told that if it found a Defendant acted maliciously, meaning with ill will or spite toward the injured party or some other improper motive, or wantonly, meaning with reckless or callous disregard of or indifference to the injured party's rights, it may award punitive damages. The jury was also advised that it was the Plaintiffs' burden to prove that the Defendant(s) acted maliciously or wantonly with regard to their rights and that punitive damages were appropriate only if they found, by a preponderance of the evidence, that the conduct of the Defendant(s) was in fact outrageous.

There is no evidence that the Defendants' entry onto the Plaintiffs' property met the standard for an award of punitive damages. The Court of Appeals held that there was sufficient evidence to support a finding of probable cause for the officers to enter the property after they received a tip from Mr. Hemingway regarding the location of illegal guns hidden in a vehicle in the backyard. *Harris v. O'Hare*, 770 F.3d 224, 233 (2014). The Court noted multiple factors that contributed to a finding of probable cause based on Mr. Hemingway's tip. For one, Mr. Hemingway was an active, high-ranking member of a violent gang, and at the time he was facing arrest for possession of heroin while on parole from a prior gun conviction, which gave him a motive to assist the police in an attempt to make his own situation less dire. *Id.* He was able to describe the alleged location of the guns with specificity, as he told the officers that they were hidden in the front seat of an abandoned Nissan Maxima in the backyard of 297 Enfield Street. *Id.* Finally, the officers testified that they had previously been successful in finding

illegal guns by obtaining similar tips from gang members about their fellow gang members. *Id.* The Second Circuit thus held that there was sufficient evidence to support the jury's finding of probable cause to act on Hemingway's tip. *Id.* The existence of probable cause negates a finding of maliciousness regarding the entry into the Plaintiffs' yard in the same way the presence of probable cause negates a finding of malicious prosecution. *Roberts v. Babkiewicz,* 582 F.3d 418, 419 (2009) (noting that in Connecticut, one of the elements that a Plaintiff must prove in a malicious prosecution claim is that the Defendant acted without probable cause). It bears mention that the Court of Appeals' recognition of the presence of probable cause leads to the conclusion that a warrant would have issued if sought by the Defendants. This means that the entry into the yard would have been authorized to the same extent as actually occurred—it just would have occurred a few hours later. This is not consistent with a punitive damages award.

    The extent of the Defendants' entry onto the property should also be considered in evaluating whether the award of punitive damages is appropriate. According to the Defendants' testimony, they officers were on the Plaintiffs' property for approximately 30 seconds. During this time, they entered the front lawn, proceeded around the side of the house, and did not even have the chance to enter the backyard before the St. Bernard noticed and chased them back toward the front of the house. Neither Plaintiff was aware that the entry had occurred at the time. Glen Harris was at work and did not arrive home until later in the evening, and although K. Harris saw the St. Bernard suddenly bolt around the side of the house, she did not know why he did so until she later realized that he had been chasing the Defendants.     .

It is undisputed that the Defendants' entry was not prompted by any improper motive or ill will. To the contrary, they were acting on a tip that they reasonably believed to be reliable with the goal of removing several illegal firearms from a community plagued by gang violence, an objectively worthy goal. They had a reason supported by probable cause to enter the property; they did not enter it based upon vague information or speculation. Again, the Defendants had never met the Plaintiffs before that day, which they testified to at trial, and did not enter their yard with any ill will or intent to cause them harm.

Furthermore both Defendants testified that they believed in good faith that no warrant was required, which was a conclusion this court did not overturn after reached by the jury in the first trial. Although the Court of Appeals reversed, it can't be said that it was an outrageous conclusion to reach, given that the 9-person jury in the first trial, properly charged on the exigent circumstances exception, unanimously found that the exception applied and this court thereafter found there was evidence sufficient to allow that verdict to stand. Still, both Defendants testified that they had learned a lesson and would not enter a yard without a warrant in the future. Punitive damages for the entry onto the property was not reasonable or legal under the circumstances of this case.

### IV.   THE JURY COULD NOT HAVE REASONABLY OR LEGALLY AWARDED COMPENSATORY DAMAGES FOR THE ENTRY OR THE TRESPASS.

The jury awarded $50,000 and $125,000 in compensatory damages to Plaintiffs Glen Harris and K. Harris, respectively. Compensatory damages are intended to provide the amount of money that will fairly and reasonably compensate a Plaintiff for injuries and losses he proves were proximately caused by a Defendant's unlawful conduct. An award of compensatory damages must be fairly based upon the evidence,

not sympathy or speculation.  The jury was instructed that it was the Plaintiffs' burden to prove the existence and extent of their injuries and/or damages and that the same were proximately caused by the unlawful conduct of one, or both, of the Defendants.  Compensatory damages may be awarded for a Plaintiff's loss of property and for reasonable and necessary expenditures incurred as a result of that loss.  They may also be awarded for emotional distress and as reimbursement for expenses related to seeking treatment for physical or emotional harm.  Compensatory damages should be proportional to the actual harm suffered and fair in light of all the evidence.

The award of compensatory damages on the Plaintiffs' entry and trespass claims was unreasonable.  As discussed above, the entry onto the property was minimal and the Plaintiffs did not suffer any actual injury as a result.  The entry and the shooting of the dog were separate issues and the jury was instructed to consider them as such.  Although there was extensive testimony related to Plaintiff K. Harris's emotional distress and subsequent mental health treatment, that evidence all pertained to the shooting of her dog, and the jury ruled in favor of the Defendants on the shooting-related claims.  Because all issues related to the shooting were found in favor of the Defendants, the damages analysis must treat the event as if there was no dog in the yard at the time of the Defendants' entry. There was absolutely no allegation that either Plaintiff suffered emotional or physical damage as a result of the Defendants' mere entry into their yard, nor was there a claim that the Defendants caused any damage to their lawn or home.  The Defendants' entry did not harm the Plaintiffs or their property in any way, so a compensatory award is not warranted.  The jury should have been limited to an award of nominal damages for the entry and zero damages for trespass.

Furthermore, Connecticut law does not allow for recovery of noneconomic damages as a result of impairment to property only. "Our common law has never recognized a right to sue an individual for intentional or negligent infliction of emotional distress resulting from injury to such property as a pet." *Myers v. Hartford*, 84 Conn.App. 395, 853 A.2d 621, cert. denied, 271 Conn. 927, 859 A.2d 582 (2004). The standard as articulated in *Myers* is true even if the owner witnesses another causing death or serious physical injury to a pet. *Carcaldi v. McKenzie,* Docket No. DBDCV136013956S, 2014 WL 2257138, *2 (Conn. Super. Ct. April 24, 2014); *Medura v. Town & Country Veterinary Assocs., P.C.*, Docket No. HHDCV116018916S, 2012 WL 3871953, *6 (Conn. Super. Ct. August 10, 2012); *Coston v. Reardon*, Docket No. 063892, 2001 WL 1467610, *3—*4 (Conn. Super. Ct. October 18, 2001); *Bonilla v. Conn. Veterinary Center*, Docket No. CV136040848S, 2013 WL 7020508, *2 (Conn. Super. Ct. December 18, 2013); *but see Vaneck v. Drew*, Docket No. MMXCV085003942S, 2009 WL 1333918, *4–*5 (April 20, 2009) (reasoning that with regard to a negligent infliction of emotional distress claim, a dog's owned held the status of a foreseeable victim of bystander emotional distress). Accordingly, the only damages that can be claimed associated with the loss of a pet animal is the purchase price of the animal or a similar animal, as that amount would compensate a Plaintiff for the loss of his/her property.

With regard to the award of compensatory damages for the search claim, the analysis is different, but does not compel a different conclusion. Federal common law governs the determination of damages in actions brought under 42 U.S.C. § 1983. *Busche v. Burkee*, 649 F.2d 509, 518 (1981). Under § 1983, compensatory damages

may include out-of-pocket losses and other monetary harms, along with impairment of reputation, humiliation, and mental anguish and suffering. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307, 91 L.Ed.2d 249 (1986). However, although compensatory damages for emotional distress are permitted under § 1983, the Fourth Circuit reasoned that these damages must be established by sufficient evidence and cannot be presumed to result from every constitutional violation. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1250 (4th Cir. 1996). The Supreme Court has held that nominal damages are the appropriate remedy in a situation where a violation of rights is proven, but actual injury is not:

> Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance of organized society that those rights be scrupulously observed, but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042 (1978).

One recent district court decision held that prohibiting recovery for emotional damages related to the loss of, or harm to, an animal caused by a violation of § 1983 would conflict with the compensatory and deterrence purposes of the section. *Moreno v. Hughes*, 157 F.Supp.3d 687, 690 (E.D. Mich. 2016). However, in that case, the seizure of the animal was the civil rights violation at issue. *Moreno*, 157 F.Supp.3d at 688. In the case at bar, the civil rights claim at issue was the entry into the yard, and the seizure of the Plaintiff's St. Bernard was found to be justified under both federal and state law. Accordingly, the compensatory damages award can never be justified by the

Plaintiffs' loss of their pet dog, and there is no evidence of any injury to person or property as a result of the entry alone.  Accordingly, the Jury could not reasonably or legally have awarded compensatory damages.

## V.     QUALIFIED IMMUNITY

Although the jury found for the Defendants on the 4th Amendment seizure issue, the Plaintiffs have filed a post-trial motion challenging the validity of that finding.  Accordingly, it is appropriate for the Defendants to assert their qualified immunity defense to the 4th Amendment seizure claim in their post-trial motion**.**  Qualified immunity shields government officials in the exercise of their discretionary functions from awards of monetary damages unless a Plaintiff can prove "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 179 L.Ed.2d 1149 (2011).  An official sued under 42 U.S.C. § 1983 is entitled to qualified immunity unless it is proven that his or her conduct violated a clearly established constitutional right at the time of the action(s) in question.  *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).  This "clearly established" standard serves to protect the balance between constitutional rights and government officials' abilities to perform their job duties by ensuring that they will have a reasonable ability to anticipate when their conduct may expose them to liability.  *Davis v. Scherer*, 468 U.S. 183, 195, 82 L.Ed.2d 139 (1984).

A government official's conduct violates clearly established law when, at the time it occurs, "[t]he contours of [a] right are sufficiently clear that *every reasonable official would have understood that what he is doing violates that right.*"  *Ashcroft* 563 U.S. at

741 (*citing Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987)) (emphasis added) (internal quotation marks omitted). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 89 L.Ed. 2d 271 (1986). The existing precedent at the time of the official's action(s) must have placed the impropriety of the conduct in question *beyond debate*. *Ashcroft*, 563 U.S. at 741 (emphasis added). The question of whether an official was protected by qualified immunity in a certain situation obviously requires a fact-specific analysis, and the Court has consistently cautioned against defining clearly established laws at "high level[s] of generality," because doing so avoids the dispositive question of whether a government official's conduct was reasonable in the particular circumstances that he was faced with at the time he acted. *Plumhoff*, 134 S. Ct. at 2023. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009), citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004); *see also Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law.").

      The Plaintiffs claimed that Officer O'Hare unlawfully seized the dog by shooting it and Officer Pia contributed to this unlawful seizure by failing to prevent the shooting. The jury ultimately decided this issue in favor of the Defendants and it is undisputed that there was, at minimum, sufficient evidence to justify a belief by a belief by a Police Officer in Officer O'Hare's shoes that he faced a substantial risk of serious physical injury at the time O'Hare fired his weapon at the St. Bernard. This applies as well to

establish it reasonable that officer Pia did not intervene. The evidence is also undisputed that Officer Pia had no opportunity to intervene, regardless of how the conduct of Officer O'Hare is viewed.

The jury had before it evidence that upon reaching the corner of the side and back of the house, the Officers saw a dog in the backyard. The dog saw them and immediately gave chase, so the Defendants began running back toward the front of the property. The dog was barking, snarling, snapping his teeth, and shaking his head from side to side as he chased them. Officer Pia was the first of the two to reach the front of the house and was able to run off the Plaintiffs' lawn. Officer O'Hare, however, could hear the dog steadily gaining on him and knew that he would not be able to outrun the animal. Officer O'Hare testified that when he reached the front of the lawn, he turned, drew his service weapon, and yelled at the dog "Get back, get back, get back!" Instead of retreating, the dog prepared to lunge, so Officer O'Hare fired three shots and two struck the dog.

The Defendants are entitled to qualified immunity on this claim. With regard to the seizure claim against Officer O'Hare, it was reasonable for him to shoot the dog because at the time he did so, the dog had caught up to him in the front yard and was showing no indication that it would halt its attack. The dog was 120 pounds and had been exhibiting aggressive behavior while pursuing the officers. Although Officer Pia was able to run out of the Plaintiffs' yard, Officer O'Hare realized that he would not be able to do the same before the dog caught up to him. Furthermore, he knew that the yard was not entirely fenced in, so there was no barrier that would have prevented the dog from continuing to pursue them off the property even if he could make it to that

point. Officer O'Hare made the decision to shoot the dog for the safety of himself and Officer Pia after they first attempted to evade the animal.

Officer Pia is also entitled to qualified immunity on the Plaintiffs' claim that he improperly failed to prevent Officer O'Hare from shooting the dog. For one, as noted, it was reasonable for Officer O'Hare to shoot. Additionally, even if there had been a reason to prevent Officer O'Hare from shooting, Officer Pia did not have a real opportunity to intervene. As noted above, these events unfolded over the span of about 30 seconds. Officer O'Hare was immediately behind Officer Pia as they ran from the dog. Officer Pia was able to exit the property, but he testified that he had not even had a chance to turn around to face the Plaintiffs' home before he heard the shots. He did not know that Officer O'Hare had drawn his gun or was about to shoot. It cannot realistically be argued that Officer Pia had time to turn around, realize what was happening, evaluate the situation, and prevent the shooting given the timeframe in which these events occurred.

Considering the Defendants' actions in the context of the qualified immunity analysis described above, it is clear that they are entitled to qualified immunity on the Plaintiffs' seizure claims because shooting the dog was objectively reasonable and, with regard to Officer Pia, there was no opportunity to prevent it. It cannot be argued that every reasonable official would have understood shooting the dog to be in violation of the Plaintiffs' rights. Although police officers are encouraged not to use force in the performance of their duties if avoidable, they are also not obligated to subject themselves to bodily harm by not acting to defend themselves when the situation warrants it. If Officer O'Hare had not shot the dog, both he and Officer Pia would have

been at risk of severe bodily harm. Using the inquiry regarding reasonableness as explained in *Ashcroft,* every reasonable officer would not believe that the Defendants' conduct in this situation was unlawful – in fact, most would likely agree that the Defendants acted properly to protect themselves from danger. Thus, the Defendants are entitled to qualified immunity.

## VI. CONCLUSION

For the reasons set forth above, the Defendants ask this court to grant their renewed Motion for Judgment.

DEFENDANTS,
JOHNMICHAEL O'HARE
and ANTHONY PIA


By  */s/ Thomas R. Gerarde*
    Thomas R. Gerarde
    ct05640
    Howd & Ludorf, LLC
    65 Wethersfield Avenue
    Hartford, CT  06114-11921
    Ph:  (860) 249-1361
    Fax:  (860) 249-7665
    E-mail: tgerarde@hl-law.com

## **CERTIFICATION**

      This is to certify that on October 28, 2016, a copy of the foregoing Renewed Motion for Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Jon L. Schoenhorn, Esq.
Jon L. Schoenhorn & Associates, LLC
108 Oak Street
Hartford, CT 06106-1514

Nathalie Feola-Guerrieri, Esq.
Assistant Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103

                                                  */s/ Thomas R. Gerarde*
                                                 Thomas R. Gerarde